Argued and submitted November 10, 2020, affirmed January 12, 2022

William COX
and Diosdada "Josie" Cox,
*Plaintiffs-Appellants,*

*v.*

HP INC.,
dba HP Computing and Printing, Inc.,
a foreign corporation; and
Charter Mechanical Contractors, Inc.,
dba Charter Mechanical,
an Oregon corporation,
*Defendants,*
*and*

SPIRAX SARCO, INC.,
a foreign corporation,
*Defendant-Respondent.*

HP INC.,
dba HP Computing and Printing, Inc.,
*Third-Party Plaintiff,*

*v.*

TÜV RHEINLAND OF NORTH AMERICA, INC.,
a foreign corporation; and
Proton Energy Systems, Inc.,
a foreign corporation,
*Third-Party Defendants.*

Multnomah County Circuit Court
19CV14525; A172614

504 P3d 52

After William Cox sustained injuries from an explosion of a hydrogen generator, plaintiffs brought claims against defendant Spirax Sarco, Inc. (Spirax), an entity that supplied a component part to the generator's manufacturer. On appeal, plaintiffs argue that the trial court erred when it granted Spirax's motion to dismiss for lack of personal jurisdiction. *Held*: Spirax's activities in Oregon were insufficiently related to plaintiffs' claims so as to support the exercise of personal jurisdiction. Accordingly, the trial court did not err when it granted Spirax's motion to dismiss for lack of personal jurisdiction.

Affirmed.

Jerry B. Hodson, Judge.

J. Randolph Pickett argued the cause for appellants. Also on the briefs were R. Brendan Dummigan, Kimberly O. Weingart, Shangar S. Meman, and Pickett Dummigan McCall LLP, and Matthew D. Kaplan and Kaplan Law, LLC.

Nicholas Kampars argued the cause for respondent. Also on the brief was Wildwood Law Group, LLC.

Before DeHoog, Presiding Judge, and Mooney, Judge, and DeVore, Senior Judge.*

DeVORE, S. J.

Affirmed.

_____

* Mooney, J., *vice* Hadlock, J. pro tempore.

### DeVORE, S. J.

William Cox was severely injured when a hydrogen generator exploded at HP Inc.'s (HP) campus in Corvallis. Cox and his wife brought claims for personal injuries against a number of defendants. Defendant Spirax Sarco, Inc. (Spirax) is an entity that supplied a component part—a drain trap—to the generator's manufacturer, third-party defendant Proton Energy Systems, Inc. (Proton). In this appeal, plaintiffs argue that the trial court erred when it granted Spirax's motion to dismiss for lack of personal jurisdiction. Given the record before us, we conclude that Spirax's activities in Oregon lack the relationship to plaintiffs' claims that due process requires. For that reason, the trial court did not err in concluding that Oregon state courts lack personal jurisdiction to resolve plaintiffs' claims against Spirax. We affirm.

## I.  FACTS

Spirax is a Delaware corporation with its principal place of business in South Carolina. It manufactures a range of products, including drain traps, and it sells systems for the control and efficient use of steam, air, and other industrial fluids to commercial users. Proton purchased several FA-150 drain traps from Spirax, which Spirax shipped from its South Carolina location to Proton's manufacturing facility in Connecticut. Proton incorporated the FA-150 drain traps into its hydrogen generators,[1] one of which was the generator at issue in this case. Proton would also resell drain traps separately if a customer asked.

In 2018, HP purchased a hydrogen generator from Proton and had it installed at HP's Corvallis campus. Cox worked for Proton as a technician and was servicing the generator when it exploded.

Plaintiffs brought claims for products liability and negligence against Spirax, alleging that the drain traps were defectively designed and manufactured "in that they allowed the emission of hydrogen through the Condensate

---

[1] A hydrogen generator is a piece of equipment that produces hydrogen from water.

Drain Traps at a time when leakage of hydrogen was neither authorized nor permitted," that the drain traps failed to contain a warning about the potential danger of hydrogen leakage, and that they were not adequately inspected to reveal the danger of hydrogen leakage.

Spirax filed a motion to dismiss for lack of personal jurisdiction. Spirax attached a declaration asserting that drain traps account for a small category of its products; that it sells FA-150 drain traps in bulk to Proton; that Proton does not inform Spirax when it sends one of its products to a customer; that Spirax's total sales for all products in the United States from 2016 to 2018 was $280 million; that Spirax's total sales for products in Oregon from 2016 to 2018 was $1.2 million; that Spirax's total sales for drain traps in the United States for 2016 to 2018 was $1.6 million; that Spirax's total sales for the FA-150 drain trap in the United States for 2016 to 2018 was $122,182.66; and that Spirax only sold two FA-150 drain traps in Oregon from 2016 to 2018. Based on those facts, Spirax did not dispute that it had purposefully availed itself of the privilege of doing business in Oregon, but it argued that, because those contacts were unrelated to the claims at issue, the court lacked the ability to assert specific personal jurisdiction over Spirax.

To support personal jurisdiction, plaintiffs relied on a statement from Spirax's website that the company has a "global presence with a local focus"; a statement from Spirax's parent company's annual report that the company planned to increase its direct sales presence in the western United States; and Spirax's reported $1.2 million in direct sales in Oregon from 2016 to 2018. With all that, plaintiffs asserted, Spirax had sufficient contacts with Oregon for its courts to exercise personal jurisdiction over Spirax. Plaintiffs added that a stream of commerce theory would support personal jurisdiction, because the injury occurred in Oregon and because Spirax sold its drain traps to a nationwide manufacturer and distributor, thereby purposefully availing itself of doing business in Oregon.

Unpersuaded, the trial court granted Spirax's motion to dismiss.

## II.   LAW

In reviewing a trial court's ruling on a motion to dismiss for lack of personal jurisdiction, we consider the facts as alleged in plaintiff's complaint, any relevant supporting affidavits, and other evidence submitted by the parties. *Robinson v. Harley-Davidson Motor Co.*, 354 Or 572, 576, 316 P3d 287 (2013), *abrogated in part on other grounds by Cox v. HP Inc.*, 368 Or 477, 494, 492 P3d 1245 (2021). Plaintiffs bear the burden of alleging and proving facts sufficient to establish jurisdiction over a particular defendant. *Id.* Once the jurisdictional facts are established, we review the determination of personal jurisdiction for errors of law. *Portland Trailer & Equipment v. A-1 Freeman Moving*, 166 Or App 651, 654, 5 P3d 604, *adh'd to as modified on recons*, 168 Or App 654, 4 P3d 741 (2000).

In Oregon, a court that has subject matter jurisdiction has personal jurisdiction over an out-of-state defendant as authorized in the state's long-arm statute—ORCP 4—if the exercise is consistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Cox v. HP Inc.*, 368 Or 477, 480-81, 492 P3d 1245 (2021) (*Cox I*); ORCP 4 L. The "catchall provision" in ORCP 4 L, upon which plaintiffs rely, confers jurisdiction to the extent permitted by due process. *Id.* at 481; ORCP 4 L. Naturally then, our analysis under ORCP 4 is guided by the decisions of the United States Supreme Court. *Robinson*, 354 Or at 577.

The Due Process Clause limits the power of a state court to render a personal judgment against an out-of-state defendant. *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 582 US ___, ___, 137 S Ct 1773, 1779, 198 L Ed 2d 395 (2017). The primary focus of a personal jurisdiction analysis is the nature and extent of the defendant's relationship to the forum state. *Id.* A defendant has a relationship sufficient to satisfy the demands of due process where maintaining suit in the state is reasonable and "does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 US 310, 316-17, 66 S Ct 154, 90 L Ed 95 (1945) (internal quotation marks omitted).

Since *International Shoe Co.*, the Supreme Court has recognized two types of personal jurisdiction: general jurisdiction and specific jurisdiction. *Bristol-Myers*, 582 US at ___, 137 S Ct at 1779-80. A court has general jurisdiction over a defendant as to any and all claims, even those unrelated to the defendant's activity in the state, when the defendant is essentially at home in the state. *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 US ___, ___, 141 S Ct 1017, 1024, 209 L Ed 2d 225 (2021). Plaintiff does not argue that Spirax, which is incorporated in Delaware and has its principal place of business in South Carolina, has sufficient contacts with Oregon to be subject to general jurisdiction. *See id.* (explaining that a corporation is "at home" in its place of incorporation and principal place of business).

Specific jurisdiction is "very different" and covers a narrower class of claims. *Bristol-Myers*, 582 US at ___, 137 S Ct at 1780. For a court to exercise specific jurisdiction, "the *suit* must arise out of or relate to the defendant's contacts with the *forum*." *Id.* (emphases in original; internal quotation marks and alterations omitted). The Supreme Court has explained:

> "In other words, there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation. For this reason, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction."

*Id.* (internal citations, quotation marks, and alterations omitted).

After the Supreme Court's opinions in *Bristol-Myers* and *Ford Motor Co.*, the Oregon Supreme Court clarified the specific jurisdiction inquiry. *Cox I*, 368 Or at 495-96. First, a defendant must have a minimum relationship with Oregon, which is established when the defendant takes an action by which it purposefully avails itself of the privilege of conducting its business in Oregon. *Id.* at 496. Next, the claims at issue must "arise out of or relate to" those Oregon activities that establish a defendant's purposeful availment.

*Id.* The court has called that second inquiry the "related-ness inquiry." *Id.* at 486 (internal quotation marks omitted). The Oregon Supreme Court rejected the idea that the defendant's Oregon activities must always be the direct, but-for cause of the plaintiff's claim in order to satisfy the "arise out of or relate to" requirement. *Id.* at 494.[2] Based on *Ford Motor Co.*, the Oregon court recognized that there may be some cases where, although the defendant's in-state actions did not directly give rise to the relevant claims, the defendant may have so systematically served the state's markets that the reach of its actions did in some way "relate to" the claims. *Id.* In those instances, the relationship among the defendant, the forum, and the litigation is still close enough to support specific jurisdiction in the absence of a but-for causal link. *Id.*

As indicated, this case involves an evaluation of whether Spirax's activities in Oregon gave rise to or are sufficiently related to plaintiffs' claims, where there is no direct, but-for causal link between Spirax's forum-state activities and plaintiffs' claims. Before making that evaluation, we consider recent cases explaining the relatedness inquiry.

In *Ford Motor Co.*, the Supreme Court focused on the second inquiry of whether the plaintiffs' claims "arose out of or related to" Ford's activities in which it purposefully availed itself of doing business in the forum states. The plaintiffs were residents of the forum states and were injured in car crashes in the forum states while driving allegedly defective Ford vehicles. 592 US at ___, 141 S Ct at 1022-23. Ford had originally sold and manufactured the vehicles outside of the forum states. *Id.* at ___, 141 S Ct at 1023.

Ford, however, had engaged in other extensive activities in the forum state. *Id.* at ___, 141 S Ct at 1023-24. Ford had sold more than 2,000 of the exact model and year of car involved through dealerships in the forum states; Ford had, "[b]y every means imaginable," urged residents of

---

[2] Whether a state court's exercise of jurisdiction comports with fair play and substantial justice is incorporated into that secondary inquiry. *Cox I*, 368 Or at 495 n 10.

the forum state to buy its vehicles, including through billboard ads, TV and radio commercials, print ads, and direct mail; and Ford had encouraged the forum states' citizens to become "lifelong Ford drivers" through its ongoing marketing of maintenance and repair services. *Id.* at ___, 141 S Ct at 1028.

Ford argued that the claims did not "arise out of" Ford's forum contacts in a direct, "but for" capacity, where it had sold the cars outside the forum state and there was not a direct, in-state connection to the particular plaintiffs. The Supreme Court focused on the "back half" of the "arise out of or *relate to*" inquiry to determine whether Ford's forum contacts were nonetheless sufficient to support jurisdiction because the actions "related to" the forum contacts without a causal showing. *Id.* at ___, 141 S Ct at 1026.

In light of the many forum state activities, the Court determined that "Ford had systematically served a market" in the forum states "for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States." *Id.* at ___, 141 S Ct at 1028. Further, "except for" those forum state activities, the Court found that "the owners of [the] cars might never have bought them[.]" *Id.* at ___, 141 S Ct at 1029. Therefore, there was a "strong relationship among the defendant, the forum, and the litigation—the essential foundation of specific jurisdiction." *Id.* at ___, 141 S Ct at 1028 (internal quotation marks omitted). Because Ford conducted so much business in the forum states in which it did enjoy the benefit and protection of their laws, and those activities related to the claims, it was fair and foreseeable to exert jurisdiction over Ford in those states. *Id.* at ___, 141 S Ct at 1029-30.[3]

A claim, however, does not automatically "relate to" a defendant's forum state contacts whenever a defendant has activities in the forum state. *Id.* at ___, 141 S Ct at 1026. Instead "the phrase 'relate to' incorporates real limits[.]" *Id.* at ___, 141 S Ct at 1026.

---

[3] In a concurring opinion, Justice Alito described Ford's forum state activities as having a "rough causal connection" to the claims. *Id.* at ___, 141 S Ct at 1033-34 (Alito, J., concurring in the judgment).

In *Cox I*, an opinion involving a third-party defendant in this case, the Oregon Supreme Court explored the limits of jurisdiction dependent upon a "related to" nexus between forum contacts and a claim. In that opinion, the court analyzed the Oregon activities of TÜV, the company that inspected and certified Proton's design of the hydrogen generator in Connecticut, to determine if Oregon state courts could exert specific jurisdiction over TÜV. *Cox I*, 368 Or at 483-84.

There was no dispute that TÜV had sufficient minimum contacts with the state and had purposefully availed itself of the protection of Oregon's laws through its activities in the state: TÜV was certified by the State of Oregon as a "Field Evaluation firm" that was allowed to assess and certify products within the state; TÜV had a Portland office and was promoting its services in Oregon; TÜV described itself on its website as a "'world leader in compliance testing and certification'" that was "'committed to providing a complete menu of compliance and auditing services'" to customers throughout the northwest, including Oregon; TÜV conducted at least one seminar on robot safety in Oregon; and TÜV regularly conducted certification of HP products within Oregon. *Id.* at 499-500.

Those Oregon activities, however, were not closely enough related to HP's claims regarding TÜV's inspection of the hydrogen generator at issue to support specific jurisdiction in this case. *Id.* at 501. Unlike Ford's activities in the relevant forum states, the court determined that TÜV's Oregon activities had neither connected it to other prospective Oregon purchasers of products like the Proton hydrogen generator nor had TÜV so systematically served the Oregon market that its activities indirectly motivated the purchase of the hydrogen generator. *Id.* at 502. Instead, there was no evidence in the record that TÜV marketed its inspection services to other Oregon clients or that any Oregon company had previously purchased a product that TÜV certified. *Id.* The record also did not show that TÜV had systematically served any market in Oregon, particularly not to the level that Ford had, for any product, and therefore there was no evidence that TÜV's marketing efforts were roughly linked to the motivation behind the purchase of the generator.

*Id.* at 503. Finally, it would not have been fair to exercise jurisdiction over TÜV in Oregon where the litigation in this case was "related to Oregon through the path of HP's purchase of a product that TÜV did not certify for an Oregon company and did not market to an Oregon company." *Id.* at 504. Although TÜV benefited from the protection of Oregon laws as to its other forum activity, that benefit did not relate to TÜV's out-of-state certification of the generator.

## III.   APPLICATION

A.   *Framing the Question*

As in *Ford Motor Co.* and *Cox I*, Spirax does not dispute that it purposefully availed itself of the privilege of directly conducting business in Oregon. From 2016 to 2018, the years immediately preceding Cox's injuries, Spirax sold $1.2 million worth of products in Oregon. That amount includes 183 drain traps of various models over those three years, of which two were FA-150s, the model incorporated into the hydrogen generator. Spirax had a regional sales office in Long Beach, California, that served 12 western states, including Oregon.

As we understand it, plaintiffs first argue that, based on Spirax's concession that those activities amount to purposeful availment and the fact that the explosion occurred in Oregon, it is appropriate to exercise specific jurisdiction over Spirax. Plaintiffs, however, largely do not explain how their claims against Spirax in this action "arise out of or relate to" those contacts. That second inquiry, particularly where Spirax has conceded purposeful availment, goes to the "essence of specific jurisdiction," which by its nature covers a narrower class of defendants than does general jurisdiction. *Id.* at 497.

Our analysis focuses on the question whether the relationship among Spirax, Oregon, and the present litigation is "close enough" to support specific jurisdiction. In their claims against Spirax, plaintiffs assert that the drain traps were defectively designed, manufactured, and inspected, and contained inadequate warnings for their use in the hydrogen generator. Our task, then, is to determine whether

those claims are "closely enough" related to Spirax's Oregon activities.

Spirax argues, too readily, that, because plaintiffs have failed to establish that any of its Oregon activities were the direct, but-for cause of the explosion of the hydrogen generator in Oregon, plaintiffs' claims do not "arise out of or relate to" Spirax's forum state contacts. As explained in *Cox I* and *Ford Motor Co.*, however, the lack of a but-for causal connection does not negate the possibility that Spirax's Oregon activities may still sufficiently "relate to" the claims and support the exercise of specific jurisdiction. *Ford Motor Co.*, 592 US at ___, 141 S Ct at 1026; *Cox I*, 368 Or at 493-94.

B.   *Relatedness Inquiry*

Here, we follow the same fact-intensive, case-specific analysis regarding Spirax's Oregon contacts as the court did in *Cox I*. First, we consider whether Spirax's Oregon contacts connected it to other prospective purchasers of products like the hydrogen generator. Second, we consider whether Spirax's Oregon contacts were so systematic as to connect the purchase of this hydrogen generator to Spirax's sales or marketing efforts in Oregon. And, third, we consider whether the benefits Spirax received from the protection of Oregon law relate to the path that brought the hydrogen generator, and thus Spirax's drain traps, to Oregon. As we have foreshadowed, we conclude that the relationship between Spirax's identified activities in Oregon and the present claims is not close enough to assert specific personal jurisdiction over Spirax.

First, there is little evidence that Spirax marketed its drain traps for use as component parts in hydrogen generators to other customers in Oregon. In *Ford Motor Co.*, the Court emphasized that Ford had sold the exact vehicles in question to other customers in the forum state for years. *Ford Motor Co.*, 592 US at ___, 141 S Ct at 1028 ("Ford had systematically served a market [in the forum states] for the very vehicles that the plaintiffs allege malfunctioned and injured them ***."). By contrast, in *Cox I*, the court determined there was not a close enough connection to customers

of items like the TÜV-certified generator where there was only evidence that TÜV conducted certifications for *other* products in Oregon. *Cox I*, 368 Or at 502-03.

As for Spirax, the indications of its Oregon marketing are several: a broad statement on its website that Spirax has a "global presence," which plaintiffs argue includes Oregon; the fact that Spirax had a regional sales manager that customers in 12 western states could contact; and the fact that Spirax filled orders for 183 drain traps for Oregon customers from 2016 to 2018.

Like the court in *Cox I*, we are unpersuaded that plaintiffs' reliance on Spirax's general advertising for a "global" audience through its website assists in establishing a close relationship between Spirax, the forum, and the present litigation. *See Cox I*, 368 Or at 507 (explaining that the court is "skeptical that the Due Process Clause permits Oregon to look elsewhere to create a path to specific personal jurisdiction when a defendant's Oregon activities do not create that path"). The evidence in the record that Spirax was attempting to increase its global presence in 2018 does not suggest that that effort was specifically directed at Oregon (or, for that matter, received by anyone in Oregon). Any link that plaintiffs attempt to suggest between Spirax's non-targeted internet presence and the possibility that a customer in Oregon would purchase any type of drain trap from Spirax is too tenuous to help support a nexus between that advertising and this litigation.

At best, Spirax's Oregon sales connect it to customers seeking various models of drain traps for any number of uses or to regulate the drainage of any number of liquids from any number of gases. That circumstance is similar to the Oregon customers seeking TÜV's certification services for any number of products. Nothing about Spirax's activities connected it to other Oregon businesses like HP, which purchased a generator that used a drain trap in connection with regulating the flow of hydrogen. Therefore, there is no evidence, unlike in *Ford Motor Co.*, of Spirax's systematic sales to other customers in the state of the very product at issue.

Second, again unlike in *Ford Motor Co.*, plaintiffs have not offered any evidence attempting to link Spirax's systematic marketing or sales efforts in the state to the possibility that Spirax had purposefully cultivated a reputation as a reliable drain trap manufacturer in the state so as to motivate HP's purchase of the hydrogen generator in Oregon. There is no suggestion in the record that HP would not have purchased the hydrogen generator—or acquired the drain traps that Proton incorporated into the generator—if Spirax had not previously sold 183 drain traps or $1.2 million of miscellaneous products in Oregon.

Third, there is no evidence in the record that the way in which Spirax benefitted from the protection of Oregon laws relates to the claims at issue here. Of course, Spirax did benefit from Oregon law to the extent that its direct sales of $1.2 million worth of products to Oregonians, including 183 standalone drain traps, involved protections such as "the enforcement of contracts, the defense of property, [and] the resulting formation of effective markets." *Ford Motor Co.*, 592 US at ___, 141 S Ct at 1029 (internal quotation marks omitted). The claims in this case, however, are based on Spirax's sale of drain traps from its headquarters in South Carolina to Proton's manufacturing facility in Connecticut for their use in hydrogen generators. Therefore, the path of this litigation is not dependent on, nor related to, the benefits that Spirax received from Oregon law based on its in-state activity.

Based on that fact-intensive inquiry, we conclude that there is not a relationship "close enough" between Spirax's activities in Oregon and the claims at issue in this litigation—claims that focus on drain traps as component parts in hydrogen generators—to support specific jurisdiction.

C.   *Stream of Commerce*

Plaintiffs' contention that specific jurisdiction is supported under a "stream of commerce" theory is unavailing. As we understand it, plaintiffs argue that, in the alternative to a theory of direct purposeful availment, Spirax also purposefully availed itself of doing business in Oregon

by entering its drain traps into the stream of commerce. Plaintiffs argue that, by selling drain traps to Proton, which Proton then incorporated into hydrogen generators, Spirax "purposely placed its products in the stream of commerce in Oregon" in a way that made it reasonably foreseeable that Spirax could be sued in Oregon for the sale of defective products there.

The "stream of commerce" is a theory that sometimes supports specific jurisdiction by establishing that a defendant has purposefully availed itself of conducting business in the forum state. *Goodyear Dunlop Tires Operations, S. A. v. Brown*, 564 US 915, 927, 131 S Ct 2846, 180 L Ed 2d 796 (2011); *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 US 873, 881-82, 131 S Ct 2780, 180 L Ed 2d 765 (2011). In a products liability action, a stream of commerce case occurs where a nonresident defendant, acting outside the forum, places in the stream of commerce a product that ultimately causes harm inside the forum. *Goodyear*, 564 US at 926. In such cases, the stream of commerce refers to the movement of goods from manufacturers through distributors to consumers with the expectation that the goods will be purchased by consumers in the forum state. *Nicastro*, 564 US at 881.

For example, the Oregon Supreme Court has concluded that a battery manufacturer purposefully availed itself of doing business in Oregon where there was a "'regular . . . flow' or 'regular course' of sales" of 1,102 wheelchairs, which contained the manufacturer's batteries, resulting from the wheelchair distributor's nationwide sales efforts. *Willemsen v. Invacare Corp.*, 352 Or 191, 203, 282 P3d 867 (2012), *cert den*, 568 US 1143 (2013) (quoting *Nicastro*, 564 US at 889 (ellipsis in *Nicastro*)).

The record before us shows a single sale of a Proton hydrogen generator, involving two Spirax drain traps, occurring in Oregon. The United States Supreme Court has never held that a single sale of a product in a state through a stream of commerce constitutes an adequate basis for asserting jurisdiction over an out-of-state defendant, "even if that defendant places his goods in the stream of commerce, fully aware (and hoping) that such a sale will take

place." *Nicastro*, 564 US at 888-89 (Breyer, J., concurring in the judgment); *Willemsen*, 352 Or at 203.

Further, stream of commerce cases, even where there is more than one documented sale through the identified "stream," typically require "something more, such as special state-related design, advertising, advice, marketing, or anything else." *Nicastro*, 564 US at 889 (Breyer, J., concurring) (internal quotation marks omitted). As our earlier analysis shows, any of Spirax's other Oregon activities reflected in the record, even where Spirax conceded that they amounted to purposeful availment, fail to adequately support specific jurisdiction under a "relatedness" analysis.

Given this record, Spirax's limited participation in the stream of commerce does not establish the requisite close relationship between Spirax, Oregon, and the litigation necessary to satisfy due process.

## IV.   CONCLUSION

On the record before us, we conclude that Spirax's activities in Oregon are insufficiently related to plaintiffs' claims so as to support the exercise of specific personal jurisdiction in this litigation. The trial court did not err when it granted Spirax's motion to dismiss for lack of personal jurisdiction. We affirm.

Affirmed.